# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00007

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CREEKSIDE CONDOMINIUM HOMEOWNERS ASSOCIATION, a/k/a Creekside Condominium Homeowners Corporation,

    Defendant.

## COMPLAINT

The United States of America brings this action to enforce Title VIII of the Civil Rights Act of 1968, as amended ("the Fair Housing Act" or "FHA"), 42 U.S.C. §§ 3601-3619, on behalf of Jason Neilson and Kirsten Swick, pursuant to 42 U.S.C. § 3612(o), and alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 3612(o).

2.    Venue is proper under 28 U.S.C. § 1391(b) because the subject property and the events and omissions giving rise to the claims alleged in this Complaint occurred within the District of Colorado.

1

## PARTIES AND SUBJECT PROPERTY

3. Plaintiff is the United States of America.

4. At all relevant times, Jason Neilson was the owner of Unit G12 at 1312 Brush Creek Lane, Snowmass Village, Colorado. Kirsten Swick is Neilson's domestic partner and has lived with Neilson in Unit G12 since 2014. Swick is an individual with a disability under 42 U.S.C. § 3602(h), and Neilson and Swick are "aggrieved persons" within the meaning of the FHA, 42 U.S.C. § 3602(i).

5. Defendant Creekside Condominium Homeowners Association is a homeowners association that governs and enforces rules and regulations for Creekside Condominiums, an owner-occupied, deed-restricted housing complex with 27 condominium units in three buildings, including 1312 Brush Creek Lane. The homeowners association is governed by a Board of Managers ("Board").

## FACTUAL ALLEGATIONS

6. Swick has depression and anxiety that substantially impair her ability to engage in major life activities such as working, interacting with others, and being alone.

7. Creekside has a policy prohibiting all pets with the exception of one cat per unit. In March 2015, the Board adopted a resolution creating procedures for making requests for reasonable accommodation for "service animals." This resolution required the Board to grant reasonable accommodations to individuals with disabilities, and permitted the Board to ask for "reliable documentation of a disability and their disability related need for a service animal."

### A. Neilson and Swick made a request for reasonable accommodation to the Board, and provided various forms of documentation of Swick's need for an emotional support animal from three providers on five different occasions.

8. On December 14, 2016, Neilson and Swick acquired an emotional support dog named Tallulah. They submitted a letter to the Board from Dr. Jacqueline Neilson, Ph.D., Licensed Psychologist and Psychoanalyst, indicating that an "emotional support animal is a perfect companion and excellent alternative treatment for persons suffering from depression and anxiety . . . [Swick's] psychiatric disability severely limits her ability to tolerate loneliness." Dr. Neilson concluded the letter by requesting that Swick be permitted to have an emotional support animal as a reasonable accommodation.

9. On December 22, 2016, the Board met with Neilson and Swick and decided that Dr. Neilson's letter did not "meet legitimate requirements" required to verify Swick's disability and need for an emotional support animal.

10. At the December 22, 2016 meeting, Neilson and Swick submitted additional documentation for the Board to consider. They provided a note from Dr. Michael Check, M.D., indicating that he had prescribed medication for Swick starting on February 20, 2015, for "chronic anxiety," a note indicating that Swick was "diagnosed with an anxiety disorder by Dr. Check . . . since February 2015," and animal registry certificates for the emotional support dog.

11. On January 8, 2017, the Board met again and rejected Neilson and Swick's additional documentation. It concluded that the documentation was "vague, has conflicting dates for treatment," and offered to hold a hearing for Neilson and Swick.

12.     The Board sent a "Notice of Non-Compliance" to Neilson and Swick on January 11, 2017, and Neilson and Swick requested a hearing to plead their case.  The Board also notified Neilson and Swick that they would be fined for having the emotional support animal on the property beginning on January 23, 2017.

13.     Because the Board banned the emotional support animal from Creekside, Neilson and Swick were forced to choose between living with the emotional support animal or leaving their home.  They chose to continue living with the emotional support animal.  Between January 27, 2017, and June 14, 2017, Neilson and Swick stayed at five different residences belonging to friends or relatives, and spent more than a week living in their van so that they could continue to reside with Swick's emotional support animal.

14.     The Board held a hearing on February 8, 2017, and at the conclusion of the hearing, the Board formally denied Neilson and Swick's request for a reasonable accommodation.  The Board provided a list of requirements that Neilson and Swick would have to meet in order for the Board to approve Swick's request for reasonable accommodation, which included:

- Required medical documentation to be renewed every 2 years.
- Document addresses the Board and is provided on authentic medical stationery or letterhead.
- Document states the patient meets the definition of disability under the FHA.
- Document states the patient's daily functional limitations imposed by his/her disability.
- Document states the patient has a disability[-]related need for an assistance animal.
- Document states the particular species of animal the medical licensee deems necessary to assist with this disability.

- Document states how long the patient has been under the care of the medical licensee, with dates of medical appointments.
- Document is signed by the medical licensee presently treating the patient for his/her disability.
- Document by medical licensee will be verified by our counsel.

Documentation with a second medical opinion is recommended, but not required. We reserve the right to require additional documentation as needed.

15. Board members also commented at the February 8, 2017, hearing that the Board would only accept "authentic letters on authentic medical stationery," as opposed to copies of documents, and that "[i]f you're for real, you're going to do the legwork."

16. On February 10, 2017, the Board e-mailed Neilson and Swick a "Notice of No Waiver," stating that "[t]he dog is not permitted at Creekside."

17. On February 16, 2017, Neilson and Swick sent the Board a letter from Patti Present, a Licensed Clinical Social Worker. Present works with the Aspen Hope Center, a crisis counseling center serving Pitkin and Eagle counties. Present's letter stated, in part, that "Client has suffered from severe anxiety for a number of years and was prescribed an emotional support animal to help relieve the symptoms to help her function on a daily basis. Ms. Swick is continuing counseling from the Hope Center as well as being supported by her emotional support animal and medication." The letter also offered to answer any questions "to see that her request be approved by the Housing Board." No member of the Board spoke to Present.

18. On February 23, 2017, the Board decided that the letter from Present was insufficient, stating that "[t]his new letter is from an individual who, it seems, is not the person who has been analyzing and treating [Swick] for her condition when the dog was prescribed.

5

The consensus of the Board is that this letter doesn't meet the documentation requirements for ESA [emotional support animal]."

19.     On February 28, 2017, Neilson and Swick provided copies of Swick's medical records from Dr. Check's office.  These records verified that Swick had seen Dr. Check as early as February 20, 2015, for, among other things, "uncontrollable anxiety rapid heart rate sweaty armpits . . . she feels she has had it for a while but worse lately . . . ."  The records reflect that Dr. Check prescribed medication to treat Swick.

20.     On March 3, 2017, the Board again rejected Neilson and Swick's request based on Dr. Neilson's letter, Present's letter, and the prescription note and medical records from Dr. Check's office, stating that the "new document is simply a record of Dr Check prescribing [Swick] medication for chronic anxiety."  The Board also informed Neilson and Swick of their belief that "[Neilson and Swick] wanted a dog and made the decision to get a dog before any medical licensee diagnosed a legitimate need."

21.     On March 21, 2017, Neilson and Swick attempted for the fifth time to submit documentation that would be accepted by the Board, submitting a second letter from Present indicating that Swick "has been unable to fully cope with her depression and anxiety in both the work environment and in personal relationships."  Present's second letter further stated that "it is in my professional opinion that in conjunction with therapy and the emotional service animal, Ms. Swick would be better able to manage her medical issues."

22. On May 5, 2017, the Board notified Neilson and Swick that "after 5 months of waiting for required medical documentation to prove the ESA [emotional support animal] is legitimate, the request for [Swick's] ESA is closed. There is no need for further discussion."

**B. The Board granted a reasonable accommodation to Neilson and Swick only after being threatened with litigation by Neilson and Swick's attorney.**

23. On May 15, 2017, an attorney representing Neilson and Swick sent the Board a letter requesting that it approve the request for a reasonable accommodation.

24. In response, the Board stated that it had not yet received documentation from a medical provider who "has been treating [Swick] for this disability for a reasonable period of time."

25. On June 9, 2017, Neilson and Swick provided an e-mail from Dr. Check explaining that "it is not part of my practice of Family Medicine to make determinations on the appropriateness of [emotional support animals]." Neilson and Swick's attorney also informed the Board by email that they were preparing to sue Creekside in federal district court.

26. The Board initially responded that it would continue to deny Neilson and Swick's request, but on June 14, 2017, the Board reversed course, sending a letter through counsel citing the e-mail from Dr. Check as the basis for granting Neilson and Swick's request for a reasonable accommodation.

C. **The Board retaliated against Neilson and Swick by assessing fines against them and informing the entire Creekside community that a $500 special assessment was being levied against each unit because Neilson and Swick had made a request for a reasonable accommodation.**

27. On January 11, 2017, before Neilson and Swick were able to have a hearing regarding the emotional support animal, the Board threatened to fine them for having the animal on the property.

28. On January 24, 2017, the Board notified Neilson and Swick via e-mail that it had voted to fine them for having the emotional support animal beginning on January 23, 2017.

29. At the Board's February 8, 2017, meeting, the Board stated that it would retroactively levy fines of $100 per day against Neilson and Swick, and would continue to fine them as long as the dog remained on the property.

30. The Board's February 10, 2017, e-mail to Neilson and Swick confirmed that it would be retroactively fining them for having their emotional support animal on the property.

31. Despite the fact that Neilson and Swick complied with the Board's request that the emotional support animal not stay at Creekside, the Board continued to levy fines against Neilson and Swick.

32. On February 24, 2017, the Board informed Neilson and Swick that it would continue to levy fines for having the emotional support animal on Creekside property unless Neilson executed a notarized document stating that the animal was not, in fact, residing at Creekside. Neilson and Swick submitted a letter signed by four individuals, including Neilson, confirming that the emotional support animal had not resided at Creekside since January 27,

2017. The signatories all submitted copies of their driver's licenses to verify their identities and signatures.

33. On March 8, 2017, the Board informed Neilson and Swick that they had to pay $3,650 in fines by March 20, 2017, for having their emotional support animal on the property, or else the Board would place a lien on Neilson's unit.

34. Despite the fact that Neilson and Swick submitted the documentation requested by the Board, the Board did not waive its fines against Neilson and Swick until June 14, 2017, when the Board's attorney sent a letter to Neilson and Swick's attorney granting their request for a reasonable accommodation.

35. On June 28, 2017, Neilson and Swick's attorney notified the Board that they had filed an administrative complaint against Creekside with the Colorado Civil Rights Division ("CCRD").[1]

36. On August 29, 2017, the Board notified Creekside residents of a special assessment of $500 being levied on all homeowners "to cover legal costs and potential liability arising from the Board's enforcement of the Association's 'No Dog' rule."

37. On October 13, 2017, Board President Amber McKeague sent an e-mail to every homeowner or homeowner's representative at Creekside disclosing that Neilson and Swick's request for reasonable accommodation was the reason for the $500 special assessment:

> The fact is the Board granted "reasonable accommodation" for an ESA for Kristen [sic] Swick while living in Unit 1312 and rescinded all fines for the homeowner,

---

[1] CCRD is the "substantially equivalent agency" approved by HUD to investigate and resolve most Fair Housing Act complaints in Colorado. *See* 42 U.S.C. § 3610(f); 24 C.F.R. § 115.100, *et seq*.

9

Jason Neilson. **Jason has an attorney who has continued to threaten the HOA with litigation.** Our attorney . . . believes the Board has done nothing wrong and also thinks it wise for Homeowners to prepare for any future litigation for this matter with a special assessment. **Please remember, the money could be returned or applied to future regular assessments depending on the outcome of this one legal matter.**

We hope this clears up any questions you might have about this special assessment.

(Emphasis in original.)

## HUD Administrative Process

38.     On November 27, 2017, Neilson and Swick timely filed a housing discrimination complaint ("Complaint") with the Secretary of the Department of Housing and Urban Development ("HUD"). The Complaint alleged that Defendant Creekside discriminated on the basis of disability in violation of the Fair Housing Act, 42 U.S.C. §§ 3601-3619.

39.     Pursuant to 42 U.S.C. § 3610(a) and (b), the Secretary of HUD conducted and completed an investigation of the Complaint, attempted conciliation without success, and prepared a final investigative report.  Based on the information gathered during the investigation, the Secretary determined, pursuant to 42 U.S.C. § 3610(g)(1), that reasonable cause existed to believe that illegal discriminatory housing practices had occurred, including violations of 42 U.S.C. §§ 3604(f) and 3617.

40.     On September 25, 2019, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), charging Creekside with engaging in discriminatory housing practices on the basis of disability in violation of Sections 804(f)(1), (2), and 818 of the Fair Housing Act, 42 U.S.C. §§ 3604(f)(1), (2), and 3617.

41.     On October 14, 2019, Neilson and Swick elected to have the claims asserted in

HUD's Charge of Discrimination resolved in a civil action, pursuant to 42 U.S.C. § 3612(a).

42. Following the Notice of Election, the Secretary of HUD authorized the Attorney General to commence a civil action pursuant to 42 U.S.C. § 3612(o).

43. The United States and Defendants executed tolling agreements tolling any statute of limitations relating to the claims in this action until January 8, 2020.

## Fair Housing Act Violations

44. The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1 to 43 above.

45. By the conduct described above, Defendant engaged in discriminatory housing practices in violation of 42 U.S.C. § 3604(f)(1), (2), and (3)(B):

   a. Swick is a person with a disability because she has severe anxiety and depression that limit her ability to tolerate loneliness, work, interact with others, and engage in other major life activities.

   b. Neilson and Swick first informed the Board of Swick's disability and her need for a reasonable accommodation on December 14, 2016, and then subsequently followed up on that request with additional documentation on December 22, 2016, February 8, 2017, February 16, 2017, February 28, 2017, March 21, 2017, May 14, 2017, and June 9, 2017.

   c. Defendant refused and unreasonably delayed making a reasonable accommodation in its rules, policies, practices, or services, when such accommodations were necessary to afford Neilson and Swick equal opportunity to use and enjoy a dwelling, by

11

      refusing to grant Neilson and Swick an exception from its "no pets" policy as a reasonable accommodation for Swick's disability, in violation of 42 U.S.C. § 3604(f)(3)(B);

d. Defendant's refusal to make a reasonable accommodation denied and made unavailable to Neilson and Swick a dwelling, making them homeless for a five-month period, in violation of 42 U.S.C. § 3604(f)(1); and

e. Defendant discriminated in the terms, conditions, or privileges of the sale of a dwelling, because of a disability, in violation of 42 U.S.C. § 3604(f)(2).

46. By the conduct described above, Defendant threatened, coerced, intimidated and retaliated against Neilson and Swick, in violation of 42 U.S.C. § 3617:

a. Neilson and Swick engaged in protected activity when they made a request for a reasonable accommodation beginning on December 13, 2016, and when they filed an administrative complaint against Creekside under the FHA on June 27, 2017;

b. Defendant threatened, coerced, and intimidated Neilson and Swick by threatening to assess and actually assessing $3,650 in fines and fees against them for allegedly having Swick's emotional support animal at Creekside; and

c. Defendant threatened, coerced, and intimidated Neilson and Swick by sending a notice to all their neighbors saying that a special assessment of $500 had to be levied against all Creekside tenants to cover legal fees incurred defending against Neilson and Swick's request for a reasonable accommodation.

WHEREFORE, the United States prays for relief as follows:

a. Declare that Defendant violated the Fair Housing Act, 42 U.S.C. §§ 3601-3619;

b. Enjoin Defendant, its officers, employees, agents, successors, and all other persons in active concert or participation with them, from:

   i. discriminating in the sale or rental of, or otherwise making unavailable or denying, dwellings to buyers or renters because of a disability, in violation of 42 U.S.C. § 3604(f)(1);

   ii. discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2);

   iii. failing or refusing to make reasonable accommodations as required by 42 U.S.C. § 3604(f)(3)(B);

   iv. coercing, intimidating, threatening, or interfering with Neilson and Swick on account of their having exercised or enjoyed their rights, in violation of 42 U.S.C. § 3617;

   v. failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Neilson and Swick to the position they would have been in but for the discriminatory conduct; and

   vi. failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future;

    c. Award monetary damages to Neilson and Swick, pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1); and

    d. Any other legal and equitable relief that the Court finds to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated January 2, 2020.

                                          JASON R. DUNN
                                          United States Attorney

                                          *s/ Zeyen J. Wu*
                                          Zeyen J. Wu
                                          Assistant United States Attorney
                                          1801 California Street, Suite 1600
                                          Denver, CO 80202
                                          Telephone: (303) 454-0100
                                          Fax: (303) 454-0411
                                          zeyen.wu@usdoj.gov

                                          Attorneys for the United States